## ALFRED WILLOUGHBY v. ERIE RAILROAD COMPANY.

Argued June 4, 1908—Decided November 9, 1908.

1. *Held*, that by the clear weight of evidence in this case the plaintiff contributed to the accident by his negligence.
2. The raising of the safety gates across the highway at a railroad crossing will not excuse a person intending to cross the tracks from the duty of looking and listening.

---

On rule to show cause.

Before Justices REED, BERGEN and VOORHEES.

For the plaintiff, *John L. Johnson.*

For the defendant, *Cortlandt & Wayne Parker.*

The opinion of the court was delivered by

VOORHEES, J. The plaintiff, the driver of a brewery wagon, in crossing the Erie railroad at Bloomfield avenue, in the city of Passaic, was injured by a collision with an eastbound train.

Plaintiff was attempting to cross from south to north. The railroad tracks are constructed through the middle of Main avenue, the right of way being about forty-five feet in width, and are fenced in on both sides with a fence and privet hedge. On the south side of the right of way Main avenue is sixty feet in width and has two trolley tracks upon it, the nearer trolley track being about fourteen feet from the railroad. Bloomfield avenue is fifty feet in width. Westerly two hundred and seventy-nine eighty-hundredths feet from Bloomfield crossing is the Jefferson street crossing. The train which did the damage was running from west to east. The hedge is four and one-half feet high. The brewery wagon driven by the plaintiff was of sufficient height so that the plaintiff sitting upon it had a clear view over the top of the hedge. It was claimed, however, that five telegraph poles located about one hundred and twenty-five feet apart, parallel with the right of way, obstructed his view of the track. Of these poles the first, five inches in diameter, stood thirty feet from Bloomfield avenue crossing, then next were two other five-inch poles, then an eighteen-inch and a twelve-inch pole. The wagon had stopped about twenty feet away from the gates, which were down because of a train passing to the westward. The horses were standing crosswise, diagonally across Main street, facing toward the gates.

The plaintiff testified: "I looked around and couldn't see nothing and I started driving. The gates lifted up and I looked around and couldn't see nothing. I started on and drove my horses on, and when I got just to the gate I looked around again and couldn't see nothing. When I drove on the track I looked around again. Just as my horses got on the track I heard a shout and I looked around and saw a train approaching through a cloud of smoke."

This smoke came from the train which had just passed going westward, and was first seen by the plaintiff when he got on the track. The smoke had then come down. He did not hear any whistle or bell. On cross-examination he said that when the westbound train had passed, "I looked both ways and I listened and looked up the track and couldn't

see nothing. When the gates lifted up I looked around again and couldn't see nothing, so I started to drive."

He also said that the gates went up about a couple of seconds after the westbound train passed, and a couple of seconds after the gates went up he started. It is not disputed that the locomotive of the westbound train and that of the eastbound train, which inflicted the injury, passed each other at about the Jefferson street crossing about two hundred and eighty feet distant from Bloomfield avenue.

It is quite evident from the testimony that a train could be seen at a distance of seven hundred feet. The photographs offered also demonstrate this fact.

One witness says he saw two wagons waiting at the gates, one on each side of the Bloomfield avenue crossing, and that when the gates went up both wagons started to pass over. As soon as he opened the gates the wagons started to go over.

Another witness, the driver of one of the wagons, says the westbound train wasn't quite passed before the gates were opened, and he and the plaintiff both started to cross. A woman called at him and waved her hand, and he turned and saw the train and pulled his horses back, while the plaintiff whipped up his horses; that they both started before the gates were completely up.

Another witness saw the trains pass at Jefferson street and saw the plaintiff coming under the first gate. The end of the westbound train was clear of the crossing and the two trains were passing each other at Jefferson street.

Another witness, standing on the west side of the crossing between the trolley tracks and the railroad, saw the train coming from the depot and stepped forward to stop the plaintiff, but his horses were then on the track. He had to turn his horses somewhat and then proceeded across when the gates were nearly up. This witness says: "I stepped forward to stop him. At the same time he saw the train himself and lashed his horses."

The depot referred to was over seven hundred feet from the crossing.

These witnesses were all produced on the part of the plaintiff.

The fact that about the time of the raising of the gates and a second or so before the plaintiff turned his horses in preparation to start across the railroad, the eastbound train had about reached Jefferson street crossing, say three hundred feet away (for the two trains met there), is quite conclusive upon the point that before the plaintiff had passed upon the track, and while yet in a place of safety, the eastbound train had approached within seven hundred feet of the crossing and had come well within his line of vision and was unobscured by smoke. If it be true that he looked before starting, he must have looked ineffectually. If the track was obscured by smoke when he looked he ought to have waited until the smoke had cleared away. His testimony negatives the idea that there was smoke at that time, for plaintiff says he did not see the smoke until the westbound train had passed and he had gotten upon the tracks. If the poles interfered such obstruction was easily overcome. A slight movement on the part of the observer would have accomplished it, and prudence should have dictated to the plaintiff, if, indeed, he discovered that he could not see because of the poles, to take a different standpoint for his observation. He, however, did not complain of the poles. He said he didn't see anything.

The Court of Errors and Appeals, in *Central Railroad Co.* v. *Smalley,* 32 *Vroom* 277, has laid down the rule that the duty of a traveler in crossing a railroad to look and listen must be performed by doing those things which will make its performance reasonably effective. Therefore, the plaintiff with a view of over an eighth of a mile, must be held to have contributed to the accident by proceeding to cross without observing the approaching train, for a proper observation must have revealed it. *Diele* v. *Erie Railroad Co.,* 41 *Vroom* 138; *Beeg* v. *New York, Susquehanna and Western Railroad Co.,* *Id.* 56; *Winter* v. *New York and Long Branch Railroad Co.,* 37 *Id.* 677; *Van Riper* v. *New York, Susquehanna and Western Railroad Co.,* 42 *Id.* 345.

The raising of the gates did not excuse him from exercising

this caution, for it has been held that the neglect to give warning by a railroad of the approach of a train to a highway crossing, when even so gross as to amount to a declaration that the way is safe for travelers, does not absolve a person about to cross the tracks from the duty of making an independent observation. *Swanson* v. *Central Railroad Co., 34 Vroom* 605.

The clear weight of evidence is that the view was unobstructed and that the plaintiff contributed to the accident by his negligence.

The defendant's counsel requested the court to charge the jury that if they find that the plaintiff's negligence is shown by a preponderance of the evidence they need go no further, and a verdict should be found for the defendant, provided that negligence contributed to the accident. This the court refused to do. It was a sound proposition of law and should have been charged.

The rule will be made absolute and a *venire de novo* awarded.